943 So.2d 1240 (2006)
KOSTMAYER CONSTRUCTION, INC.
v.
SEWERAGE & WATER BOARD OF NEW ORLEANS.
No. 2005-CA-1184.
Court of Appeal of Louisiana, Fourth Circuit.
October 18, 2006.
*1242 George B. Recile, Chehardy Sherman Ellis Breslin Murray Recile & Griffith, L.L.P., Metairie, LA, for Plaintiff/Appellee, Kostmayer Construction, Inc.
Harold D. Marchand, Attorney IV, Jacob Taranto III, Deputy Special Counsel, Gerard M. Victor, Special Counsel, Sewerage & Water Board of New Orleans, New Orleans, LA, for Defendant/Appellant, Sewerage and Water Board of New Orleans.
(Court composed of Judge JAMES F. McKAY, III, Judge TERRI F. LOVE, Judge LEON A. CANNIZZARO, JR.).
LEON A. CANNIZZARO, JR., Judge.
The defendant, the Sewerage and Water Board of New Orleans ("S & WB"), appeals from a district court judgment rendered in favor of the plaintiff, Kostmayer Construction, LLC ("Kostmayer")[1]. We affirm the judgment of the trial court.

FACTS
Kostmayer has been a marine contractor in the New Orleans area for 20 years. Pursuant to a public bid, the S & WB awarded Kostmayer a $1,169,200.00 contract to build improvements and refurbishments to Drainage Pumping Station No. 13 ("DPS 13") located in Algiers, Louisiana. Burk-Kleinpeter, Inc. ("BKI"), a civil engineering firm under contract to the S & WB, and its subcontractor, C & S Consultants, prepared the plans and specifications for the project.
The contract contained three major line items of work: driving new steel pile walls to strengthen the bulkhead between the pump station and the Intracoastal Canal; pouring concrete on the bottom of the discharge basin; and revising the levees on either side of the pump station and the discharge basin.
Kostmayer began driving the steel sheet piles in April 2002, using a large crane mounted on a barge, which floated in the Intracoastal Canal at the discharge basin. Sometime thereafter, Kostmayer's work crew experienced an electrical current or shock as they were guiding the piles into place. Initially, it was merely an irritant, but as the job progressed, the current became stronger and posed a safety hazard to the workers.
In addition to providing the plans and specifications, BKI also provided contract administration for the project. On May 22, 2002, Kostmayer contacted BKI's chief field engineer, Adam Mehn, requesting permission to shut down the job until the safety hazard could be corrected; BKI agreed.
BKI notified the S & WB of the shutdown, and the parties, including the S & WB, immediately began an investigation to find the source of the current. They first suspected a stray current from the pump station or an unknown underground wire, or a malfunction in the crane's electrical system. These possible sources were excluded *1243 within the first day or two of the investigation.
Within the next few days, employees from the S & WB's electrical department ran tests, which indicated that the probable culprit was Radio Frequency Interference ("RFI"), a relatively obscure phenomenon. RFI will occur when a structure of conductive metal located in a field of transmitted radio waves acts as a receiving antenna and absorbs those radio waves into electrical energy in the structure. In this case, the investigators believed Kostmayer's 180-foot steel crane boom was acting as a giant radio antenna, collecting and focusing the electrical energy from three radio station transmission towers in the vicinity[2].
Kostmayer immediately hired an expert from Highlines Construction Company, a contractor specializing in building towers for electric utility companies, to assist. The Highlines expert recommended that Kostmayer use nylon straps to lift the steel piles in the hopes of breaking the electrical current. Kostmayer tried this, using a simple strap around the load, rather than a steel cable. While this simple change reduced the voltage, it did not reduce it enough to ameliorate the hazard.
BKI then requested the S & WB to authorize BKI to hire an electrical expert at the S & WB's expense, to recommend a solution to the problem; the S & WB agreed. BKI hired a local electrical engineer, David Kanter. After initial inquiry, Mr. Kanter determined that the problem was too specialized for him, so he hired an expert from North Carolina, Lawrence Behr.
Mr. Behr confirmed the problem was RFI and, after conducting several tests, recommended a much more complex arrangement of nylon straps and slings to insulate the crane and break the electrical circuit in the boom antenna. With Mr. Behr's help, Kostmayer immediately implemented the suggestion. It was successful and Kostmayer resumed work immediately.
By then, however, the project had been shut down from May 22 through June 18, 2002, a total of 27 days. Kostmayer submitted a proposed change order or claim for $108,247.48, which included the cost of repairing or replacing the crane boom hoist cable damaged by the current ($10,683.10), and $97,614.38 for costs of personnel and equipment maintained during the down-time. BKI, believing the change order was justified, recommended that the S & WB approve it. After the S & WB refused the change order, Kostmayer filed suit.
Following trial, the court awarded Kostmayer damages in the amount of $108,297.48, as well $79,963.66 for the retainage[3] owed under the contract and reasonable attorney's fees to be determined at a later hearing. In her reasons for judgment, the trial judge stated that Kostmayer had not breached the standard of care owed by a contractor, and the electrical arcing which caused the delays and damages was an unforeseeable event. The trial court further held that pursuant to the contract the parties did not expect the contractor to bear the burden imposed by the unforeseen condition. The S & WB appealed.

*1244 ASSIGNMENTS OF ERROR
The S & WB raised nine assignments of error:
1. The trial court erred in determining that "the fact that the Board approved the hiring of experts to solve the electrical problem undercuts its entire defense to this case."
2. The trial court erred in its interpretation of paragraph 26 of the contract between the S & WB and Kostmayer where the court said, "it is recognized that the Contractor is not to be charged with liquidated damages or any excess cost for delay in completing work when the delay is due to unforeseen causes beyond the control of the contractor and without fault or negligence on [its] part."
3. The court erred in determining that radio frequency interference was a changed or differing condition.
4. The court erred in its interpretation of paragraph 31 of the specifications entitled "Extra Work."
5. The court erred in applying paragraph 26 of the contract specifications to the facts of this case relative to "unforeseeable causes."
6. The court erred in determining that "it [had] not been established that Kostmayer had a duty to conduct any testing with regard to these towers given their distance from the site."
7. The court erred in finding that "the S & WB breached its agreement with Kostmayer when it refused Kostmayer's claim for additional costs and damage to the crane and that it owes Kostmayer the sum of $108,297.48."
8. The court erred in awarding Kostmayer attorney fees for "withholding the retainage."
9. The trial court erred in not determining that Kostmayer failed to mitigate its damages.

STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the fact finder's conclusion was reasonable. Bonnette v. Conoco, Inc., 2001-2767 (La.1/28/03), 837 So.2d 1219. If the trial court or jury's findings are reasonable in light of the record reviewed in its entirely, the court of appeal may not reverse. Id.

DISCUSSION
We now address the issues raised by the S & WB in the nine assignments of error, though not in that order.
Assignment of error 6
With respect to the sixth assignment of error, the S & WB contends that Kostmayer had a duty to inspect the work site and conduct tests in accord with OSHA[4] regulations prior to beginning the work, but it failed to do so. According to the S & WB, OSHA regulation 1926.550[5] specifically set *1245 forth the steps that had to be taken prior to working near transmission towers where an electrical charge could be induced in the equipment to be used. It argues that the construction contract required the contractor to perform all work in accord with OSHA regulations and, thus, if Kostmayer had conducted a proper site inspection before the work began, then it would have been aware that the radio transmission towers near DPS 13 might pose a problem to the workers operating a crane at the project site.
James Kostmayer, the president of Kostmayer, testified that he personally participated in the site inspection that took place at DPS 13 before entering into the contract. According to him, the site inspection allows prospective bidders to come to the project site to familiarize themselves with the area and the physical properties of the landscape. Mr. Kostmayer acknowledged that during the inspection at DPS 13, he saw the radio towers in the distance, but in his thirty years of experience as a civil engineer, he had never encountered RFI as a result of working near radio towers. For that reason, he testified, it never occurred to him to conduct any tests to determine whether RFI would occur. Mr. Kostmayer also explained that in order for a contractor such as Kostmayer to learn of RFI prior to entering into the contract, it would have to tow a crane to the job site to test for the specific problem. Such action would have been highly unusual at a pre-bid inspection because it would have been too costly to do. Towing a crane to the job site, alone, would have cost a contractor approximately $5000.00, he estimated.
James Pritchett, an expert in the field of crane operation and OSHA regulations relative to crane operation and inspections, testified on behalf of Kostmayer. He opined that Kostmayer complied with OSHA regulations and the prescribed industry standards relative to crane use before and after commencing work on the project. Mr. Pritchett testified that he did not consider the radio transmission towers, which could be seen from a distance from DPS 13, to be "near" the job site as contemplated by OSHA regulations. Thus, in his opinion, Kostmayer had no reason to suspect the towers were dangerous or could pose a threat to the workers at the site, which would have imposed a duty on it to conduct further tests.
Mr. Kanter, the electrical engineer initially consulted by BKI with the S & WB's approval, testified that he had never encountered the RFI problem in his thirty years as an electrical engineer and that the phenomenon could not have been anticipated or identified without the expertise of a specialist in the field. He, too, did not consider the transmission towers to be "near" the work site within the meaning of the OSHA regulations.
The foregoing testimony and other evidence in the record indicates that Kostmayer conducted a reasonable site inspection prior to bidding on the project. The rarity of the RFI phenomenon, coupled with the expense in towing a crane to the job site, would have made any further inspection unreasonable and overly burdensome. Thus, we find no error in the trial court's finding that Kostmayer's site *1246 inspection was reasonable under the circumstances. Moreover, the evidence supports the finding that Kostmayer complied with OSHA regulations in performing the work under the contract. Thus, we find no merit to the issue raised in the sixth assignment of error.
Assignments of error 2, 3 and 5
Assignments of error two, three, and five encompass the issues of whether the RFI was an "unforeseeable" cause or condition as contemplated under paragraph 26 of the contract specifications and, if so, which party was responsible for bearing the cost for the delay in completing the contract as a result of the unforeseeable condition. The S & WB contends that the RFI was a foreseeable condition, which would exculpate it from any liability to Kostmayer. It points out that the conditions at the work site were not unique in that radio towers were common and that contractors had performed work "using cranes in the vicinity of such towers for years." Alternatively, the S & WB asserts that RFI was not a condition that actually existed on the S & WB property where the contract work was being performed and, thus, it was not responsible for any changes in the contract as a result of the condition.
As previously mentioned, Mr. Kostmayer and Mr. Kanter both testified that they had never encountered RFI at a job site in their thirty years of experience as practicing engineers. Also, Mr. Pritchett testified that Kostmayer could not have anticipated the electric arcing problem prior to beginning the work. Contrary to the S & WB's assertion, Mr. Kanter testified that even though the source of the electrical current, i.e., the radio towers, was not located on the work site, it created a physical condition on the site, which was not foreseeable. The S & WB presented no evidence to contradict this testimony. Thus, we find no error in the trial court's determination that RFI was an unforeseeable condition that Kostmayer could not have discovered prior to commencing work at the job site.
Furthermore, upon review of the contractual provisions, we find the trial court correctly held that the parties did not intend for Kostmayer to bear the burden imposed by any unforeseen condition. Specifically, paragraph 26, under the general provisions of the contract, provides, in pertinent part:
However, the contractor shall not be charged with liquidated damages or any excess cost for delay in starting or completing the work or in making deliveries of materials when the said delay is due to unforeseeable causes beyond the control of the Contractor and without fault or negligence on his part. [emphasis added]
The interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. To ascertain the parties' intent, the court must first look to the words and provisions of the contract. Amend v. McCabe, 95-0316 (La.12/1/95), 664 So.2d 1183; R.J. Messinger, Inc. v. Rosenblum, 2003-2209, 2003-2210 (La.App. 4 Cir. 5/11/05), 904 So.2d 760. When the words of a contract are clear and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046.
It is undisputed that all parties agreed that the work could not continue until the safety hazard posed by the electrical arcing was resolved and the delay, to some extent, was unavoidable. Also, the evidence in the record reflects that Kostmayer incurred additional costs and damages as a result of the delay. It is clear from paragraph 26 of the general provisions of the contract that the parties did not intend *1247 for Kostmayer to bear the additional costs incurred by the delay in completing the contract as a result of the unforeseen RFI and electrical arcing experienced by the workers at the job site.
Assignment of error 4
Similarly, in the fourth assignment of error the S & WB contends the trial court wrongly applied paragraph 31 of the general provisions of the contract to find the costs incurred by Kostmayer as a result of the delay constituted "Extra Work" under the contract. Specifically, it contends that extra work as contemplated by the contract included work required by the S & WB pursuant to a change order that was not part of the original contract. The S & WB argues that extra work did not include the adjustments made by Kostmayer to its crane in order for it to perform work under the contract. Kostmayer, the S & WB contends, was solely responsible for its own equipment and safety at the job site.
Paragraph 31 of the general specifications, relative to "Extra Work," provides, in part:
When, for the proper prosecution of the contract, work becomes necessary which has not been provided for in any clause of the contract, the Engineer will issue an order, and the Contractor shall perform the work stated in the order. Such work, frequently called "Extra Work" may be paid for in any or all of the following ways as determined by the Engineer in each case . . .
In this case, both Mr. Kostmayer and Mr. Kanter testified that a contractor could not have anticipated RFI at the time the bids were submitted. Thus, the contractor could not have included the cost to repair the crane boom hoist cable damaged by the electrical arcing and the cost to adapt the crane to counter the RFI problem into the bid price. Although the repairs to the hoist cable and the use of additional nylon straps and slings to insulate the crane were not requested or specified by the S & WB in a change order, it is undisputed that these repairs and modifications were necessary to complete the project. Thus, we find no error in the trial court's determination that these items constituted extra work pursuant to paragraph 31 of the general provisions of the contract to be paid by the S & WB.
Assignment of error 7
In the seventh assignment of error, the S & WB challenges the trial court's findings that the S & WB breached the contract with Kostmayer when it rejected Kostmayer's claim for additional costs and damage to the crane and that it owes Kostmayer the sum of $108,297.48. The S & WB contends that the additional costs awarded at trial are excessive.
In support of its argument, the S & WB offered the expert testimony of Philip Lachin, a civil engineer with expertise in analyzing delay claims in construction contracts. Mr. Lachin testified that the claim submitted by Kostmayer was not adequately documented. He noted that Kostmayer provided no evidence to substantiate the additional labor costs or the rates requested for the equipment used in the project. Regarding the equipment, he noted the rates submitted by Kostmayer appeared to reflect standard in-use operating rates, which are not generally applicable to idle equipment. Mr. Lachin explained the difference between excusable, inexcusable and compensable delays. According to him, if the delay resulted in an unforeseen condition that was not caused by the owner, it would, at best, be an excusable delay, but not necessarily a compensable one. Mr. Lachin also opined that Kostmayer failed to demonstrate the actual impact the electrical problem caused *1248 on the construction schedule. Assuming the delay was due exclusively to the electrical problem, Mr. Lachin believed that delay could have ended on May 30, 2002, when the recommended nylon sling was first used, rather than three weeks later on June 18, 2002. By the earlier date, he said, the cause of the problem and the solution had been identified. And, in his opinion, the "fix", i.e. the nylon sling, and the "implementation of the fix" were the responsibility of the contractor. If the delay had ended on May 30, 2002, the delay costs submitted by Kostmayer would have been reduced approximately one-fourth to one-third of the amount claimed, Mr. Lachin testified. Additionally, Mr. Lachin noted that the electrical arcing posed a safety hazard to Kostmayer's workers and, under the construction contract, Kostmayer was responsible for safety at the project site. He explained, too, that work originally associated with the provisions of the contract should not be considered as extra labor costs. In his opinion, the solution to the electrical arcing dilemma entailed modifying the configuration of the contractor's equipment or, in other words, involved the contractor's "means and methods" of performing the work, which under the contract was exclusively the responsibility of Kostmayer.
However, the testimony of Peter Burk, the project engineer who was serving as the fair arbiter for the project, suggests otherwise. After the problem arose, Mr. Burk met with Kostmayer to negotiate a change order and to determine the fair amount owed to Kostmayer because of the delay and damage to the crane. Following negotiations, he submitted a change order to the S & WB, reflecting an amount he believed to be fair and equitable to all parties. The two claims within the change order included $10,683.10 for damage to the crane and $97,614.38[6] incurred as actual delay damages due to the 27-day shut down of operations.
During the negotiations, Mr. Burk requested numerous documents including certified payroll records, which Kostmayer produced. Mr. Burk testified that the documentation provided to him was adequate to support the amount included in the change order. Jesse Gardner, the master mechanic who repaired the crane, testified as to the repair costs, corroborating Mr. Burk's testimony.
A trial court has great discretion in awarding damages, and its determination should not be disturbed unless clearly wrong. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied., Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Moreover, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Rosell v. ESCO, supra, at 844.
In view of the evidence in the record, we cannot say the trial court was clearly wrong in finding that the S & WB owed Kostmayer the sum of $108,297.48 for additional costs and damage to its crane as a result of the unforeseen condition. In this matter, the trial judge was in a position to observe the witnesses and consider their testimony. She apparently found Mr. Burk's testimony to be credible in light of his neutral position at the time he negotiated the change order.
Assignments of error 1 and 9
Next, the S & WB argues in its first and ninth assignments of error that the trial *1249 court erred in finding that Kostmayer acted appropriately to mitigate its damages. The board claims that Kostmayer failed to mitigate its damages because it did not apply an appropriate nylon sling to the crane on May 30, 2002, which could have shortened the delay by three weeks. It claims that a solution to the problem was found on May 30, 2002, which should have allowed Kostmayer to return to work immediately. The S & WB contends that had Kostmayer followed the recommendations of Highline Construction Company to use the nylon sling, further delay would have been unnecessary.
The testimony indicates that Kostmayer retained the services of Highline Construction Company to find a solution to the electrical arcing. Mr. Kostmayer implemented Highline's recommendation, using a single nylon sling, but it did not resolve the problem, as the workers continued to experience the electrical shock. Furthermore, Kostmayer did not learn the source of the RFI until June 17th or 18th, when the experts retained by BKI, Mr. Kanter and Mr. Behr, identified the problem. Rudy St. Germain, the chief of engineering at the S & WB, agreed that, for safety reasons, it was critical to identify the source of the electrical arcing before the work could resume at the site. Once the source of the problem was identified and the solution to use multiple nylon slings instead of one was determined Kostmayer resumed work on the project the next day.
The Louisiana Supreme Court has held that a plaintiff only has a duty to take reasonable steps to mitigate damages. Aisole v. Dean, 574 So.2d 1248 (La.1991). Given the overwhelming evidence showing RFI was extremely rare, we find Kostmayer made every reasonable effort to find a solution to the hazard, including retaining the services of several experts. Thus, we find no error in the trial court's conclusion that Kostmayer took reasonable steps to mitigate its damages.
Assignment of error 8
Finally, in the eighth assignment of error, the S & WB argues that the trial court erred in awarding Kostmayer attorneys fees for withholding the retainage.
All public entities shall promptly pay all obligations arising under public contracts when the obligations become due and payable under the contract. La. R.S. 38:2191(A). Any public entity failing to make any final payments after formal acceptance and within forty-five days following receipt of a clear lien certificate[7] by the public entity shall be liable for reasonable attorneys fees. La. R.S. 38:2191(B). In awarding Kostmayer attorneys fees, the trial court held that the delays set forth in La. R.S. 38:2191 had long since elapsed.
The S & WB argues that it should not be liable for attorney fees for two reasons. First, it claims that it has not yet paid Kostmayer the retainage because there has been no formal acceptance of the project and it has never received a clear lien certificate. Second, the project has not been accepted due to the disputed change order for additional costs.
Although Mr. St. Germain testified that the S & WB has not paid Kostmayer the retainage due to the disputed change order that is the subject of this litigation, that issue has no bearing on whether Kostmayer *1250 is owed the full retainage. The S & WB does not contend that the work performed by Kostmayer under the contract was defective or incomplete; nor did it offer evidence of such. Nonetheless, the S & WB arbitrarily withheld its formal acceptance pending the resolution of this dispute. Absent evidence to show that Kostmayer did not complete the work in accord with the contract specifications, we agree with the trial court that Kostmayer was entitled to attorneys fees for the S & WB's failure to pay the retainage within the delays set forth in the statute.

CONCLUSION
Accordingly, for the reasons set forth above, the judgment of the trial court in favor of Kostmayer Construction, LLC, is affirmed.
AFFIRMED.
NOTES
[1] Kostmayer Construction, LLC, was formerly known as Kostmayer Construction, Inc.
[2] Evidence in the record indicates the towers were located approximately two and one-half miles from the job site.
[3] Retainage is a portion or percentage of payments due for work completed on a contract that is held back until the entire job is completed satisfactorily.
[4] United States Department of Occupational Safety and Health Administration.
[5] OSHA, 29 C.F.R. § 1925.550(a)(15), provide in pertinent part as follows:

Prior to work near transmitter towers where an electrical charge can be induced in the equipment or materials being handled, the transmitter should be de-energized or tests shall be made to determine if electrical charge is induced on the crane. The following precautions shall be taken when necessary to dissipate induced voltages:
(a) The equipment shall be provided with an electrical ground directly to the upper rotating structure supporting the boom; and
(b) Ground jumper cables shall be attached to materials being handled by boom equipment when electrical charge is induced while working near energized transmitters. Crews shall be provided with non-conductive poles that have large alligator clips or other similar protection to attach the ground cable to the load.
(c) Combustible and flammable materials shall be removed from the immediate area prior to operations.
[6] Mr. Burk testified that this figure included costs for laborers on the project site that could not work but who were being paid by Kostmayer, as well as the costs for equipment rental.
[7] A clear lien certificate is issued by the recorder of mortgages of the applicable parish to verify that there are no encumbrances of any type, such as a material lien, against a contractor for work done on a construction project. They are common in the construction industry and are generally required in order for the contractor to receive the retainer fees held by the owner of a contract.