MATHES BRIERRE ARCHITECTS, A PROFESSIONAL CORPORATION

VERSUS

KARLTON/ISG ENTERPRISES, LLC, INTERNATIONAL SALES GROUP, LLC, AND J.S. KARLTON COMPANY, INC.

\* \* \* \* \* \* \*

NO. 2019-CA-0357

COURT OF APPEAL

FOURTH CIRCUIT

STATE OF LOUISIANA

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2015-04343, DIVISION "B-1"
Honorable Rachael Johnson,
\* \* \* \* \* \*
**Judge Rosemary Ledet**[*]
\* \* \* \* \* \*

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Regina Bartholomew-Woods, Judge Tiffany G. Chase, Judge Dale N. Atkins)

**LOBRANO, J., CONCURS IN PART, DISSENTS IN PART, AND ASSIGNS REASONS.**
**BARTHOLOMEW-WOODS, J., CONCURS, IN PART, AND DISSENTS, IN PART**

Robert Julien Burvant
John A. Cangelosi
KING KREBS & JURGENS, P.L.L.C.
201 St. Charles Avenue, Suite 4500
New Orleans, LA 70170

      COUNSEL FOR PLAINTIFF/APPELLEE

Christine Lynn DeSue
Richard Rudolph Schulze
ATTORNEY AT LAW
3445 N. Causeway Blvd., Suite 505
Metairie, LA 70002

      COUNSEL FOR DEFENDANTS/APPELLANTS

**AFFIRMED**
**December 3, 2020**

---

[*] Judge Ledet was designated as the writer on December 1, 2020.

This is a suit for unpaid architectural services. The architect—Mathes Brierre Architects, a Professional Corporation ("Mathes")—sued its client—Karlton/ISG Enterprises, LLC ("Karlton/ISG")—asserting claims for unpaid invoices and breach of contract. Mathes also asserted an alter ego claim, seeking to pierce Karlton/LLC's company veil;[2] for this reason, Mathes also sued Karlton/LLC's two members—International Sales Group, LLC, a Florida limited liability company ("ISG Co."); and J.S. Karlton Company, Inc., a Delaware corporation ("Karlton Corp.") (collectively "Members").

Following a five-day bench trial, the trial court rendered a judgment, dated September 26, 2018, in Mathes' favor against Karlton/ISG for the sum of $944,669.23, together with "interest through May 21, 2018, at the contractual rate of eight percent (8%) per annum on the above sum, which interest shall continue to accrue from May 22, 2018 until paid" and costs to be taxed "within thirty (30) days of entry of this Judgment." The trial court also ruled in Mathes' favor on the alter ego claim, holding Members solidarily liable with Karlton/ISG for all amounts awarded to Mathes.

---

[2] As the Louisiana Supreme Court has observed, "[w]hen an LLC is involved, as opposed to a corporation, it may be more correct to refer to 'piercing the company veil' [rather than 'piercing the corporate veil']." *Ogea v. Merritt*, 13-1085, p. 6, n. 3 (La. 12/10/13), 130 So.3d 888, 895.

As instructed by the trial court in the September 26, 2019 judgment, Mathes timely filed a Motion to Tax Costs. Following a contradictory hearing, the trial court rendered a second judgment, dated January 11, 2019, in Mathes' favor and against Karlton/ISG and Members, *in solido*, for $61,366.34, the amount of costs awarded. From both judgments, Karlton/ISG and Members (collectively "Appellants") appealed. For the reasons that follow, we affirm both judgments.

### FACTUAL AND PROCEDURAL BACKGROUND

In late 2005, Karlton Corp. and ISG Co. embarked on a plan to erect a mixed commercial and residential development in New Orleans, Louisiana (the "Project"). In connection with the Project, in January 2006, Karlton and ISG formed Karlton/ISG. Karlton/ISG planned to develop the Project in multiple phases on tracts of land located in Algiers directly across the Mississippi River from the New Orleans Central Business District. The tracts of property were owned primarily by the Kern family or entities owned or controlled by the Kern family (the "Kerns").

The initial business transactions began in May 2006 when Karlton/ISG entered into an agreement with the Kerns (the "Option Agreement"). Under the Option Agreement, Karlton/ISG obtained options to purchase four tracts of property. Between March and June 2007, Karlton/ISG and the Kerns amended the Option Agreement four times. The fourth amendment stated that Karlton/ISG has exercised its option to acquire Tract I, which was to be the site of Phase 1 of the Project. Karlton/ISG also agreed in the fourth amendment to deliver a $600,000 deposit to Algiers Ventures, LLC, a Kern-related entity (the "Tract I Deposit"). The Tract I Deposit was to be evidenced by a promissory note, dated June 1, 2007, granted by Algiers Ventures to Karlton/ISG (the "Note"). Algiers Ventures did, in

fact, deliver the Note to Karlton/ISG on June 1, 2007, the same date that the parties executed the fourth amendment. The Note was secured by a multiple indebtedness mortgage in the maximum sum of $1,000,000, also dated June 1, 2007 (the "Mortgage"), granted by Algiers Ventures and certain other Kern entities in Karlton/ISG's favor. The property encumbered by the Note and Mortgage was the site of Phase 1 of the Project.

During the early stages of the Project, Mathes was retained and began performing architectural services related to the Project, including successfully applying for and receiving the required zoning for the Project in 2006.[3] In February 2007, Mathes and Karlton/ISG entered into an Abbreviated Standard Form of Agreement Between Owner and Architect, AIA Document B151 (the "AIA Agreement"). Pursuant to the AIA Agreement, Mathes agreed to provide architectural services for Phases 1 and 2 of the Project. These services included Schematic Design, Design Development, Construction Documents, Negotiation or Bidding, and Construction Administration. The AIA Agreement provided that Mathes was to be compensated $2,000,000 for Basic Services. The AIA Agreement acknowledged Mathes' past performance of Master Planning Services for the Project in the sum of $329,087.50. The AIA Agreement further provided that the payment of the Master Planning Services "shall be made upon the successful sale of the condominium units in Phase I and Phase II of the extended project in proportion to the number of units included in Phase I and Phase II."

The AIA Agreement provided that Mathes was to provide additional services to Karlton/ISG in accordance with the terms of the AIA Agreement, on an

_____

[3] From March 2006 through March 2007, Mathes directly invoiced Karlton for the services it rendered. Thereafter, Mathes invoiced Karlton/ISG.

as needed basis. These additional services included but were not limited to, numerous meetings with the zoning commission, city planning commission, and others on behalf of Karlton/ISG. The AIA Agreement provided that, if Basic Services were not completed within one year of the date of the Agreement, through no fault of Mathes, Mathes was entitled to be compensated for its services beyond that time as additional services at the rates specified in the Agreement. The AIA Agreement further provided that after sixty days, unpaid invoices shall bear interest at the rate of 8% per annum.

It is undisputed that the Basic Services provided by Mathes were not completed within one year of the date the AIA Agreement was executed. It is also undisputed that the delays associated with completion of the Basic Services were due to reasons beyond Mathes' control. Thus, Mathes continued to perform additional services for, and was entitled to be compensated by, Karlton/ISG for these additional services rendered through May 2012.

Due to Karlton/ISG's failure to pay Mathes' outstanding invoices, Mathes instituted arbitration proceedings pursuant to the AIA Agreement in July 2013. The arbitration proceedings were later dismissed due to Karlton/ISG's failure to pay its share of the arbitrator's fees. This suit followed.

After the five-day bench trial, the trial court ruled in Mathes' favor. As noted by the trial court in its written reasons for judgment, the following additional pertinent facts were established at trial regarding events that occurred in 2015:

> During 2015, the principals of ISG also engaged in separate negotiations with Barry Kern and/or entities owned or controlled by Barry Kern for the purchase of additional property that is part of the same series of riverfront tracts owned by the Kern family (or entities controlled by the Kerns) where the Project was originally intended to be located. The discussions with Barry Kern and his companies were conducted by the principals of ISG, who ultimately formed a new

entity known as River Street Ventures, LLC ("River Street"). River Street is owned by the president of ISG, Michael Ambrosio, as well as ISG's two owners, Phillip Spiegelman and Craig Studnicky.

On August 11, 2015, several Kern entities entered into a Purchase Agreement with River Street related to the purchase of the Westbank property that was intended to be the site of Phase 4 of the Project (the "August, 2015 Purchase Agreement"). Michael Ambrosio, who was the president of Karlton/ISG, executed the August, 2015 Purchase Agreement on behalf of River Street. As consideration for the August, 2015 Purchase Agreement, the Kern entities agreed to give River Street a $300,000.00 credit against the purchase price of the subject property. Pursuant to the terms of the August 2015 Purchase Agreement, River Street was required to deliver a release of the Mortgage and Note that had been granted by the Kern entities to Karlton/ISG.

The same date the August 2015 Purchase Agreement was executed, Karlton/ISG—in its capacity as the "last holder" of the Note—executed and delivered to the Kern entities a "Release by Obligee of Record" of the June 1, 2007 Mortgage. This Release by Obligee of Record was executed by Michael Ambrosio in his capacity as "president" of Karlton/ISG. Mr. Ambrosio also executed a release of the Note granted by the Kern entities to Karlton/ISG—this time in his capacity as "Managing Member" of Karlton/ISG. Mr. Spiegelman testified that Mr. Ambrosio was authorized to execute these documents on behalf of Karlton/ISG and River Street, respectively.

On May 31, 2016, River Street purchased the property that was the intended site of Tract 3 of the Project from the entities controlled by Barry Kern for more than $4 Million dollars. Mr. Spiegelman testified that River Street has engaged an architect, engineer, and received city approval to construct a 187-unit apartment complex on the Tract 3 property.[4]

Addressing the alter ego issue, the trial court observed:

In 2007, Karlton ceased making capital contributions to Karlton/ISG. Mr. Ambrosio testified that at some point after 2007, Karlton/ISG just "dissolved." He also testified that to his knowledge, no one told Mathes Brierre at the end of 2007 that the Westbank Project was being abandoned.

---

[4] The trial court observed that Mathes argues that "the principals of ISG and River Street utilized the sole asset of value owned by Karlton/ISG as a bargaining chip to enrich themselves to the detriment of creditors of Karlton/ISG, including Mathes. . . . This asset could have been utilized to satisfy a substantial portion of Karlton/lSG's outstanding debt to Mathes."

It was established that between 2008 and 2012, Mathes Brierre made demands for payment to Karlton/ISG on numerous occasions. Karlton/ISG representatives never advised Mathes Brierre that its invoices would not be paid. However, during the period between 2009 and 2012, the members of Karlton/ISG independently retained, and independently paid for, services provided by entities rendering assistance to the Project. Mr. Ambrosio testified that the members separately paid for these services because the partnership was disbanded by this time.

Mr. Mathes testified that at the direction of the principals of Karlton/ISG, Mathes Brierre continued to provide services to the Westbank Project between 2008 and 2012. Mr. Ambrosio and Mr. Mathes testified that at no time between 2008 and 2012 did the principals of Karlton/ISG or its members advise Mathes Brierre that Karlton had ceased making capital contributions to Karlton/ISG or that Karlton/ISG had ceased functioning as an independent entity. Additionally, no one affiliated with Karlton/ISG informed Mathes Brierre that Karlton/ISG had abandoned the Project. The services performed by Mathes Brierre from 2008 through 2012 were done with the knowledge of and/or at the direction of the members of Karlton/ISG in the name of Karlton/ISG.

Of note, Karlton/ISG's Operating Agreement provided for the distribution of liquidated assets in the event the company had conducted a proper dissolution when it ceased operating as a viable entity. Under such a dissolution, the company would be required to use the liquidated assets to pay all of the company's debts first. Yet, a dissolution proceeding never occurred.

The trial court found that Mathes established a breach of contract and calculated the amount due as follows:

The record is clear that Mathes Brierre sent Karlton/ISG a formal demand letter, demanding an outstanding balance of $555,689.23, which represents work done by Mathes Brierre through December 26, 2012. Thereafter, Mathes Brierre issued an additional invoice to Karlton/ISG, in the amount of $478,737.50. This Court finds that Mathes Brierre is entitled to recover the total of the unpaid invoices, excluding the $720.00 billed for Pre-Project services. These amounts total $1,033,706.73. Karlton/ISG is entitled to a credit in the amount of $89,037.50 for amounts paid for Master planning services. Therefore, Mathes Brierre is entitled to $944,669.23, plus interest at the rate of 8% per annum.

6

The trial court further found that the alter ego claim was persuasive, reasoning as follows:

> After reviewing the totality of the circumstances, this Court finds that the members of Karlton/ISG acted in a manner that disregarded the separate corporate entity. This Court finds that there was an improper diversion of the $600,000.00 Note and Mortgage for the benefit of Karlton/ISG's principals, members and affiliated entity and other evidence of co-mingling of assets. This Court further finds that there was improper tax treatment of Karlton/ISG by its members and principals.. . . Additionally, this Court finds that Karlton/ISG failed to maintain its independent existence due to the actions of its members and their principals, which misled Mathes Brierre, and other creditors, to their detriment. Therefore, this Court finds that the members of Karlton/ISG failed to conduct business on a separate footing to such an extent that the company became indistinguishable from its members.

The trial court thus rendered judgment in favor of Mathes and against Karlton/ISG and Members, *in solido,* for both the balance it found due, interest, and costs incurred in connection with the trial. This appeal followed.

## DISCUSSION

On appeal, Karlton/ISG and Members assert three errors:

> 1. The trial court erred in finding that ISG and Karlton are solidarily liable with Karlton/ISG for all amounts awarded to Mathes pursuant to the Judgment under the alter ego/piercing the corporate veil theory of liability.

> 2. The trial court erred in awarding plaintiff, Mathes, a judgment in its favor against defendant Karlton/ISG in the amount of $944,669.23.

> 3. The trial court erred in awarding Mathes the total of $61,366.34 for costs incurred in connection with the trial of the captioned matter.

For ease of discussion, we address these errors in reverse order.

### *Costs of the Trial*

Appellants contend that the trial court's award of costs of the trial should be reviewed under a manifest error standard because Mathes failed to introduce any

7

evidence in support of its alleged costs at the hearing on the Motion to Tax Costs. In support, Appellants cite the principle that "arguments and pleadings are not evidence." *Coston v. Seo*, 12-0216, p. 10 (La. App. 4 Cir. 8/15/12), 99 So.3d 83, 89. Mathes counters that an abuse of discretion standard applies and cites the principle that "[a] district court can fix expert witness fees based upon its own observations and testimony presented at trial." *Arnaud v. Scottsdale Ins. Co.*, 15-0185, p. 5 (La. App. 1 Cir. 9/18/15), 181 So.3d 759, 762. We agree.

This court outlined the governing principles for reviewing awards of costs, including expert witness fees, in *Watters v. Department of Social Services*, 08-0977, pp. 49-50 (La. App. 4 Cir. 6/17/09), 15 So.3d 1128, 1162, as follows:

> A trial court has great discretion in awarding costs (including expert witness fees) and can only be reversed on appeal upon a showing of an abuse of that discretion. The governing statutory provisions regulating the recovery of court costs are La. C.C.P. art.1920, La. R.S. 13:4533, and La. R.S. 13:3666....
>
> "Article 1920 does not mean that there are no guidelines to govern the taxing of costs." One guideline is that only costs provided for by positive law are taxable against the party cast in judgment. The jurisprudence has recognized that the types of costs recoverable as court costs are narrowly defined by statute. The types of costs that are allowed to be taxed as costs are defined in La. R.S. 13:4533....
>
> Expert witness fees for testifying at trial and for time spent preparing for that testimony are recoverable. The trial court is required to determine the reasonable amount of expert witness fees to be taxed as court costs based on "the value of time employed and the degree of learning or skill required." La. R.S. 13:3666(A). The amount actually billed by the expert is not determinative of the reasonable amount taxable as costs.

*Id.* (internal citations omitted).

The trial court, following a contradictory hearing, awarded costs to Mathes as follows: (i) expert fees paid to Asher Meyers, LLC: $34,659.05; (ii) expert fees paid to George A. Hero Architect, LLC: $5,625; (iii) costs paid for depositions

8

used in the trial: $8,576.88; (iv) costs paid for exhibits used in the trial: $2,935.69; (v) costs paid to the Clerk of Court for Orleans Parish: $8,963; and (vi) costs paid to sheriffs offices for service of process fees: $606.72. As noted, the total costs of the trial awarded amounted to $61,366.34. All of the items awarded are within the statutory provisions allowing for recovery of costs. Applying an abuse of discretion standard, we cannot conclude the trial court abused its discretion in awarding costs of the trial.

### *Breach of Contract Award*

Appellants argue that the breach of contract award should be reversed given that Mathes failed to prove the amounts owed under the contract and to mitigate damages by unreasonably accruing an outstanding balance. "The standard for reviewing an award of damages for breach of contract is whether the trial court abused its discretion." *Phillips v. Doucette & Associated Contractors, Inc.*, 17-93, p. 5 (La. App. 5 Cir. 10/25/17), 229 So.3d 667, 672. Here, we cannot conclude the trial court abused its discretion in awarding $944,669.23, together with 8% interest.

Appellants' argument that Mathes failed to mitigate its damages is that Mathes should be held accountable in allowing the outstanding balance on its invoices to unreasonably accrue. They argue that Mathes was obligated to mitigate its damages and that Mathes failed to do so. Mathes counters that the mitigation doctrine is inapposite here.

The mitigation doctrine is codified in La. C.C. art. 2002, which provides that "[a]n obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced." Although an obligee has a duty to mitigate his damages, this duty exists only if it is reasonable

9

to do so. *Merlin v. Fusilier Constr. Inc.*, 00-1862, p. 9 (La. App. 5 Cir. 5/30/01), 789 So.2d 710, 716; *see also Kostmayer Const., Inc. v. Sewerage & Water Bd. of New Orleans*, 05-1184, p. 14 (La. App. 4 Cir. 10/18/06), 943 So.2d 1240, 1249. The record does not support Appellants' claim that Mathes had a duty to mitigate its breach of contract claim. For these reasons, we find Appellants' arguments regarding the breach of contract award lack merit.

### Piercing the Company Veil

Karlton/ISG is a foreign limited liability company organized and existing under the laws of Florida. Nonetheless, we analyze the veil piercing issue under Louisiana law.[5] In its reasons for judgment, the trial court, in support of its

---

[5] Foreign limited liability companies are governed by La. R.S. 12:1342, which provides that "[t]he laws of the state or other jurisdiction under which a foreign limited liability company is organized shall govern its organization, its internal affairs, and the liability of its managers and members that arise solely out of their positions as managers and members." Citing La. R.S. 12:1342, the Louisiana Supreme Court has observed that "[q]uestions of whether a LLC has been validly formed and the extent of personal liability of members are governed by the law of the state in which the LLC is organized." *Thomas v. Bridges*, 13-1855, p. 8 (La. 5/7/14), 144 So.3d 1001, 1007. The Supreme Court has further observed that "'if the state in which the foreign LLC was formed has a standard for piercing the veil of an LLC that differs from the veil-piercing standards under Louisiana law, the rules of the foreign jurisdiction will apply to the foreign LLC.'" *Id.*, 13-1855, p. 8, n. 9, 144 So.3d at 1007 (quoting 9 LA. CIV. L. TREATISE, LLC & Partnership Bus. & Tax Plan § 1.71 (3d ed.)). Thus, it must be determined whether Florida or Louisiana law governs the piercing issue. Both Louisiana and Florida courts apply a similarly worded, strict standard for piercing the veil. Under Florida law, like Louisiana law, the requirements for piercing the veil of a limited liability company are the same as those for piercing the veil of a corporation. *Hruska v. On the Edge Dockside LLC*, 19-14095-CIV (S.D. Fla. Aug. 2, 2019), 2019 WL 5260276, *2. As the court noted in *Hruska*, the Florida veil piercing standard is a strict one, applicable in only three instances:

> Notwithstanding the limitation of liability afforded by Florida statute, it is possible to pierce an LLC's corporate veil under certain circumstances to hold individual members or managers personally liable. Under Florida law, a plaintiff must plead facts showing the following in order to pierce a corporate veil: "(i) the defendant shareholder dominated and controlled the corporation to such an extent that the corporation lacked an independent existence and the defendant was in fact an 'alter ego' of the corporation; (ii) the defendant engaged in 'improper conduct' in the formation or use of the corporation; and (iii) the improper formation or use of the corporate form injured the plaintiff."

*Id.* (internal citations omitted); *see also Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1121 (Fla. 1984) (the seminal Florida piercing the corporate veil case requiring "improper conduct"). Likewise, the Louisiana jurisprudence has recognized that piercing the veil is appropriate only in "exceptional circumstances." *Hickey v. Angelo*, 18-0550, 18-0551, p. 11 (La.

decision to pierce the veil, cited Louisiana corporate law veil-piercing principles and applied the multi-factor, totality of the circumstances analysis articulated in *Riggins v. Dixie Shoring Co.*, 590 So.2d 1164, 1168 (La. 1991). Appellants argue that the trial court's reliance on Louisiana corporate law veil piercing principles and application of the *Riggins* factors is legally erroneous. The gist of this argument is that the jurisprudential veil piercing doctrine does not apply to limited liability companies. This court has held to the contrary. *See An Erny Girl, L.L.C. v. BCNO 4 L.L.C.*, 18-0360, pp. 9-10 (La. App. 4 Cir. 9/26/18), 257 So.3d 212, 221; *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 19-0181, p. 10, n. 14 (La. App. 4 Cir. 7/31/19), 276 So.3d 589, 596.[6]

Notwithstanding this jurisprudence, Appellants contend that the exclusive manner in which a limited liability company's veil may be pierced is set forth in La. R.S. 12:1320(D), which does not include the alter ego theory of corporate veil piercing. In support of this argument, Appellants rely on *Ogea v. Merritt*, 13-1085 (La. 12/10/13), 130 So.3d 888. That reliance is misplaced.

In *Ogea*, the Supreme Court observed that the plaintiff had relied upon La. R.S. 12:1320(D) and that jurisprudential veil piercing "is a doctrine that has neither been relied upon by the lower courts in the instant case, nor invoked by the

---

App. 4 Cir. 5/29/19), 274 So.3d 47, 55. Both Florida and Louisiana courts have recognized that piercing the veil principles apply to limited liability companies.

    This case, thus, presents a false conflict. *See Lee v. Sapp*, 14-1047, pp. 4-5 (La. App. 4 Cir. 3/4/15), 163 So.3d 60, 63 (observing that a false conflict exists when "the governing law of each jurisdiction is identical, or so similar that the same result would be reached under either law." When a false conflict exists, "no need exists to determine which state's law applies." *Id.* Such is the case here. A choice of law analysis is thus unnecessary. Accordingly, we apply Louisiana law.

[6] Moreover, as the Wyoming Supreme Court has observed, "[n]o reason exists in law or equity for treating an LLC differently than a corporation is treated when considering whether to disregard the legal entity." *Kaycee Land & Livestock v. Flahive*, 46 P.3d 323, 329 (Wyo. 2002). Nonetheless, we acknowledge, as the jurisprudence has recognized, that a limited liability company's nature limits the weight to be afforded to certain factors of the veil piercing test.

plaintiff." 13-1085, p. 7, 130 So.3d at 895. Thus, the Supreme Court in the *Ogea* case neither addressed the veil piercing doctrine, nor held that it was inapplicable in the limited liability company context. In contrast, Mathes neither cited nor relied upon La. R.S. 12:1320(D) for finding Karton/ISG's Members personally liable. For this reason, this case is distinguishable from *Ogea* in which the opposite was true.

Moreover, merely because La. R.S. 12:1320(D) provides a statutory basis for finding a limited liability company's members personally liable does not dictate that the jurisprudential doctrine of piercing the company veil is inapposite.[7] Nothing in the *Ogea* case dictates that result. Indeed, the argument that La. R.S. 12:1320, as interpreted by the Supreme Court in *Ogea*, forecloses the application of jurisprudential veil piercing doctrine to limited liability companies was recently rejected by the bankruptcy court in *In re Areno*, 615 B.R. 449, 457-58 (Bankr. W.D. La. 2020). In rejecting this argument, the bankruptcy court cited three factors:

- [N]either *Ogea* nor *Nunez*[8] directly or impliedly reject the application of veil piercing doctrines to LLCs. Moreover, in briefly discussing veil piercing doctrines in *Ogea*, the Louisiana Supreme Court favorably referred to

---

[7] Moreover, the purpose of a statutory provision such as La. R.S. 12:1320(D) is to codify the principle that the members of a limited liability company are not shielded from personal liability from their own personal conduct. *See* Robert B. Thompson, *The Limits of Liability in the New Limited Liability Entities*, 32 WAKE FOREST L. REV. 1, 11 (1997) (observing that "[i]ndividuals who act for the corporations are held personally liable . . . if their action on behalf of the entity is tortious, criminal, or otherwise wrongful" and that this form of liability for direct actions is a distinct from the equitable doctrine of piercing the veil); *see also* Thomas Bourgeois, *Mirror, Mirror: Amending Louisiana's LLC Statutes Related to Personal Liability of Members to Reflect Corporate Counterparts After Ogea v. Merrit*, 76 LA. L. REV. 1339, 1368-69, n. 190 (2016) (observing that "limited liability shield does not protect owners from personal liability from their own personal conduct") (internal citation omitted).

[8] The Louisiana Supreme Court in *Nunez v. Pinnacle Homes, L.L.C.*, 15-0087 (La. 10/14/15), 180 So.3d 285, as in the *Ogea* case, confined its analysis to the statutory provision, La. R.S. 12:1320(D), and did not address whether that statutory provision provides the exclusive basis for holding a limited liability company's members personally liable.

Louisiana courts of appeals decisions applying those doctrines to LLCs, noting that the policy underlying the application of the doctrines to corporations is the same for LLCs.

- Louisiana courts of appeal have continued to apply veil piercing doctrines to LLCs post-*Ogea* and *Nunez*.

- Louisiana treatises also recognize that the same policy considerations in piercing the veil of a corporation apply to LLCs.

*Id*. at 457-58. We find the *Areno* analysis persuasive.

In light of the above analysis, we find no legal error in the trial court's analysis of the veil piercing issue. Accordingly, we apply the manifest error standard of review to the veil piercing issue. *See Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La. 1993) (observing that "[a] court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong.'"). Thus, the dispositive question is whether the trial court's finding that Mathes presented sufficient evidence to meet the strict standard for veil piercing is manifestly erroneous.

Appellants' argument focuses on the trial court's reasons for judgment.[9] The correct focus, however, is on the petition and the proof presented at trial. Mathes pled in its petition that the Members were solidarily liable under the alter ego theory of piercing and presented evidence at trial on the issue. In its petition, Mathes averred as follows:

> Karlton/ISG, at all material times, was a mere instrumentality and alter ego of Karlton and/or ISG. Karlton/ISG failed to follow the usual corporate formalities, was inadequately capitalized,

---

[9]The Louisiana Supreme Court has observed that "[a]ppeals are taken from the judgment, not the written reasons for judgment." *Greater New Orleans Expressway Comm'n v. Olivier*, 02-2795, p. 3 (La. 11/18/03), 860 So.2d 22, 24 (citing La. C.C.P. art. 1918, which provides that "[w]hen written reasons for the judgment are assigned, they shall be set out in an opinion separate from the judgment"). Nonetheless, "a court of appeal can use reasons for judgment to gain insight into the district court's judgment." *Vill. Shopping Ctr. P'ship v. Kimble Dev., LLC*, 18-740, p. 9 (La. App. 5 Cir. 4/24/19), 271 So.3d 376, 384. We refer to the trial court's reasons for judgment in this case for that purpose.

intermingled assets with Karlton and/or ISG, shared offices with ISG, was dependent upon Karlton and/or ISG for the generation of business, had joint accounting and/or payroll systems with Karlton and/or ISG, failed to operate as an independent profit center, had interlocking officers and directors with Karlton and/or ISG, and had a limited degree of independence or discretion.[10]

At trial, Mathes presented the expert testimony of Harold Asher regarding indicators of fraud, which Mr. Asher referred to as buckets. Bucket One was that Karlton/ISG's Members diverted a company asset—the $600,000 Note—to the detriment of its creditors, specifically Mathes. Bucket Two was that Karlton/ISG improperly used the corporate form for tax losses (abandonment losses) that it took in 2006 and 2007, which materially benefited its Members. Bucket Three was that Karlton/ISG stopped operating as an independent entity in 2008; this was evidenced by the fact it stopped doing what one would expect from an entity operating in a corporate form. For example, Mr. Asher observed that Karlton/ISG lacked reliable financial documents after 2007. Bucket Four was that Karlton/ISG's Members failed to notify creditors or other parties of interest in the Project that the limited liability company's activities had been abandoned and that Karlton/ISG no longer operated as an independent entity.

In its reasons for judgment, the trial court identified the following four factors, which tracked the four buckets Mr. Asher identified, as supporting its finding:

- An improper diversion of the $600,000.00 Note and Mortgage for the benefit of Karlton/ISG's principals, members and affiliated entity and other evidence of co-mingling of assets;

- An improper tax treatment of Karlton/ISG by its members and principals;

---

[10] Although Mathes pled the alter ego theory of veil piercing, "[p]iercing the corporate veil is not itself an independent [ ] cause of action, but rather is a means of imposing liability on an underlying cause of action." *Peacock v. Thomas*, 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996); *Blair v. Infineon Techs. AG*, 720 F.Supp.2d 462, 469, n. 10 (D. Del. 2010).

- Karlton/ISG failed to maintain its independent existence due to the actions of its members and their principals, which misled Mathes, and other creditors, to their detriment; and

- Members of Karlton/ISG failed to conduct business on a separate footing to such an extent that the company became indistinguishable from its members.

Given these four factors are supported by the record, we find no manifest error in the trial court's decision to pierce the veil of Karlton/ISG and hold Members solidarily liable with Karlton/ISG for the September 26, 2018 and January 11, 2019 judgments.

## DECREE

For the foregoing reasons, the September 26, 2018 and January 11, 2019 judgments of the trial court are affirmed.

**AFFIRMED**